Alvin C. Eurich and James K. Mathews, Plaintiffs-Appellees, v. Korean Foundation, Inc., a Not-For-Profit Corporation, Soon K. Hahn, Eldridge T. McSwain, Latham Castle, Attorney General of the State of Illinois, and National Boulevard Bank of Chicago, a National Banking Association, Defendants. Korean Foundation, Inc., and Soon K. Hahn, Defendants-Appellants.

Gen. No. 47,976.

First District, Second Division.

June 30, 1961.

Donald C. Gancer, of Chicago, for appellants.

Anan Raymond, Charles J. O'Laughlin and Thomas W. McNamara, of Chicago (Thompson, Raymond, Mayer, Jenner & Bloomstein, of counsel), for appellees.

MR. JUSTICE BURKE delivered the opinion of the court.

On July 28, 1956, Alvin C. Eurich and James K. Mathews filed a complaint in chancery as members and trustees of a not-for-profit charitable corporation, the Korean Foundation, Inc., to enjoin a threatened misapplication of the Foundation's funds, to restrain Soon K. Hahn, a member and trustee, from any action with respect to the funds and, in the alternative, to dissolve the Foundation. After a master's hearing and report a decree was entered dissolving the corporation and taxing all costs, including the master's fee, to Hahn. Hahn and the Foundation appealed.

The Korean Foundation, Inc., originally known as the Annie Merner Pfeiffer Foundation, Inc., was incorporated as a not-for-profit corporation in Illinois on April 29, 1940. Annie Merner Pfeiffer, Soon K. Hahn and Louise Yim were the original founders. Mrs. Pfeiffer was a wealthy American who resided in New York and who had extensive philanthropic interests including a special interest in Korean education. Mrs. Pfeiffer, after whom the Foundation was named, became acquainted with Soon K. Hahn and Louise Yim. As a result of their acquaintance and common interest, Mrs. Pfeiffer, Soon K. Hahn and Louise Yim organized the corporation and they became the first directors. The principal asset of the corporation was an agreement made May 9, 1940, by which Mrs. Pfeiffer, in consideration of the issuance to her of a life membership, promised to provide by her last will for the payment of $300,000 to the Foundation for its endowment

476

fund. On the same day a membership certificate of the Foundation, signed by Mrs. Pfeiffer as president, and Soon K. Hahn, as secretary, was issued to her as a life member. On October 28, 1942, Mrs. Pfeiffer advised the Foundation that she did not regard her pledge as binding upon her either morally or legally and revoked it. She died on January 8, 1946. In 1948, the Attorney General of Illinois sued in Cook County to dissolve the Foundation. (345 Ill App 55, 102 NE2d 756.) In that case we reversed the order appointing a liquidating receiver. The litigation was settled pursuant to a compromise agreement dated July 30, 1952, whereby the executors and residuary legatees of the estate of Mrs. Pfeiffer agreed to pay the Foundation the sum of $130,000. On August 5, 1952, a decree was entered confirming the settlement. In addition to the $130,000 paid to the Foundation, an equal amount was made available to Louise Yim to operate a school in Korea, and $40,000 was paid as attorneys' fees.

The decree provided that the Foundation be restored to all of its rights and franchises subject to the provisions of the agreement. The agreement said that the $130,000 was to be invested and reinvested and the proceeds used to provide annual scholarships not to exceed $1,000 each for the education in American universities of native-born students of Korea. On September 23, 1952, an injunction was entered against the Foundation and its officers restraining them from taking any action with respect to the Foundation funds which had been transferred to a Wisconsin bank, it being alleged that Hahn was attempting to divert the funds to his own private business. The injunction remained in force until June 4, 1954, when a decree was entered terminating the litigation. This decree provided that the Foundation should function in accordance with its charter and By-Laws; that Dr. Alvin C. Eurich, James K. Mathews, Soon K. Hahn, Paul

Daily and Edward V. Trainor constitute the membership and board of trustees of the Foundation and serve terms ending on the day preceding the first Monday in May, 1956, or until his respective successor was duly elected; and that the funds of the Foundation be deposited and maintained in a banking institution in Illinois.

Soon K. Hahn, one of the original incorporators, came to the United States in 1925 as a student and married Louise Yim who was acquainted with Mrs. Pfeiffer. They were later divorced. Since 1941 he lived at the property he acquired that year known as Korean Village in Lake Geneva, Wisconsin. In 1945 he also acquired property across the road from the Korean Village known as Stone Manor. He conducted several businesses on these properties including The Super Master Products Company, a detergent compound manufacturer, and the Oriental Trading Company, an incense manufacturer and importer. The settlement agreement of July 30, 1952, provided that the residuary beneficiaries of the estate of Mrs. Pfeiffer, which are Methodist organizations, could appoint one of the trustees of the Foundation. Dr. Mathews, a member of the Board of Missions of the Methodist Church, was selected. Dr. Eurich is an educator with the Fund for the Advancement of Education. He was formerly president of the State University of New York and acting president of Stanford University. He has been a member of the faculties of Stanford, Northwestern, Minnesota and Maine. He has a Doctor of Philosophy degree from the University of Minnesota and eight honorary doctor's degrees. He became a member of the board of trustees at the request of Hahn's New York attorney during the early litigation. Edward V. Trainor was an investment banker. He resigned all connection with the Foundation in March, 1956. Professor Daily was on the faculty of De Paul University.

478

He died during 1955. The decree of June 4, 1954, terminated the litigation which had involved the Foundation from 1948. During this six-year period no funds of the Foundation had been devoted to any of the Foundation's purposes and since that time no funds have been expended on Foundation purposes. Soon K. Hahn had been educated in American colleges and universities. Many witnesses testified to the time, energy and personal funds devoted by him to the Korean students and to the extensive use made of his Lake Geneva properties for the cultural and educational pursuits of these students.

In May, 1954, in contemplation of the entry of the decree terminating the litigation, an organizational meeting was held by the five members and trustees of the Foundation in Chicago. Between then and October, 1954, informal discussions took place between plaintiffs and Hahn about future programs and Hahn urged that additional funds be sought for the Foundation while Dr. Eurich suggested that the Foundation undertake a program that would be significant to Korean education and establish a good record with its available funds before seeking more money. Hahn indicated that his Lake Geneva properties could be used to assist the Foundation. In October, 1954, a formal meeting was held at Hahn's Stone Manor property in Lake Geneva, Wisconsin, devoted principally to organization and setting up committees. In December, 1954, there was a meeting between Hahn and plaintiffs in New York City about setting up scholarship programs for Korean students. As a result of this meeting Dr. Eurich compiled a card index of Korean students in this country with the idea of exploring the needs of Korean students already here. No formal meeting was held between December, 1954, and March, 1956. However, in numerous individual conferences and telephone conversations between Hahn and Dr. Eu-

rich during that period Hahn indicated that the purposes of the Foundation would be advanced considerably if its sole asset, the $100,000 fund, was invested in the Korean Village, Hahn's property in Lake Geneva. The suggestion was first made some time during 1955 and was repeated on numerous occasions. Dr. Eurich indicated to Hahn that the Foundation should establish a record of achievement with the funds it had available before considering reinvestment and that it was unthinkable to use the resources of the Foundation in a speculative venture.

Prior to the meeting in March, 1956, Paul Daily died, leaving four trustees of the Foundation. A meeting was called for March 6, 1956, in Chicago. Mr. Hahn and Dr. Eurich were present at this meeting. Mr. Morris, attorney for the Foundation was also there. At the start of the meeting Mr. Morris announced that Mr. Trainor had resigned from the Foundation's Board of Trustees. Hahn and Dr. Eurich then proceeded to elect Dean E. T. McSwain of the School of Education of Northwestern University to the board. Since Dean McSwain was unable to attend the meeting on March 6, it was continued until the following morning. On March 7, 1956, a meeting took place in Dr. Eurich's room at the Blackstone Hotel. Hahn, Dr. Eurich, Dean McSwain and Morris were present. At that meeting Dr. Eurich presented a proposal from Dean Charlotte D. Meinecke of Colby Junior College, New London, New Hampshire. She was making arrangements to go to Korea for the academic year 1956–1957 in order to explore the need for scholarships for Koreans to come to the United States. She needed an additional $3,000 to make the trip possible. A resolution was unanimously adopted by those present granting the $3,000 to her. Mr. Morris indicated that there might be some legal problem in connection with the use of the funds for this purpose and suggested that Dr. Eurich take the

480

matter up with the representatives of the residuary legatees of the Pfeiffer estate. On March 26, 1956, the executors of the last will of Mrs. Pfeiffer, deceased, sent a letter to the Korean Foundation expressly authorizing expenditures which would include the Dean Meinecke grant. On April 14, 1956, Hahn wrote to Dean Meinecke that her report on Korean education "will be an invaluable asset for the future work" of the Foundation, that the trustees were "very happy to vote for the $3,000 contribution towards your good work in Korea at its special meeting held in Chicago on March 6, 1956"; that he (Hahn) was "deeply moved and pledged to add $600.00 of my personal funds towards the contribution of Korean Foundation"; and that "when the Foundation mails you its check, I will deposit $600.00 of my personal funds in the Foundation account and the Foundation will mail you its check for $3,600 in the near future." Dean Meinecke subsequently contacted Dr. Eurich to say that she had not received the funds. Dr. Eurich then got in touch with Hahn several times by telephone and asked him why the check had not been sent. Hahn stated that there were legal complications involved, that in his judgment the meeting in Chicago was not a legal meeting and that the $3,000 could not be paid to Dean Meinecke. Dr. Eurich then raised the question with Hahn about the $600 which he personally pledged. Hahn said he was not prepared to do that. The major problem, he told Dr. Eurich, was releasing funds of the Korean Foundation and investing them in Hahn's Korean Village. Hahn said he would pay 7% interest on the funds invested in the Korean Village and the moment that Dr. Eurich would agree to that type of arrangement a check would go out immediately to Dean Meinecke. There were several conversations along these lines commencing in the middle of May, 1956, and extending into July, 1956. Hahn never

481

denied these conversations. When Dr. Eurich inquired about the financial operation of Korean Village and asked for a financial statement Hahn indicated he had set up a new corporation which would receive the Foundation's funds and consequently there was no financial statement available. At a dinner meeting in New York City in the spring of 1956 at which Hahn was present, Hahn's attorney indicated to Dr. Eurich that the Korean Foundation had not been able to operate because its funds had been tied up and that if the funds were to do any good to anybody, they ought to be reinvested. He suggested and urged that the funds be turned over to Mr. Hahn and invested in the Korean Village.

On June 12, 1956, Hahn, as president of the Foundation, sent a notice to Dr. Eurich, Dr. Mathews, Edward V. Trainor and himself advising that a special meeting of the board of trustees and the members of the Foundation would take place on June 23, 1956, at Stone Manor, Lake Geneva, Wisconsin, for the purpose of (1) electing new members, trustees and officers of the Foundation because the present terms of the trustees and officers had expired and (2) to take action on the recommendation of the Chairman of the Finance Committee for reinvestment of the present Foundation funds for greater annual income to carry out the purposes of the Foundation. The notice further stated: "As we have had difficulty in holding meetings by reason of failure of members and Trustees to attend, we shall consider your failure of attending this meeting as your resignation from the membership and trusteeship of Korean Foundation, Inc." No notice was given to Dean McSwain of this meeting. Dr. Eurich, Dr. Mathews and Dean McSwain informed Hahn in a letter that they would be unable to attend the June 23 meeting, the date having been chosen without prior consultation with them. Dr. Eu-

482

■■■■■■■■■■

rich further indicated that they had no intention of resigning and stated they were calling a meeting in accordance with Article III, Section 6 of the By-Laws for June 29 in New York City. Hahn responded with a letter to Dr. Eurich dated June 22 stating that the By-Laws prohibited the holding of a meeting at any place besides Stone Manor, Lake Geneva, Wisconsin, without the prior adoption of a resolution and further stated: "Although the terms of your honorary membership and Trusteeship have expired, in order to prevent your holding such illegal meeting, and to protect the Foundation, I do, under the powers granted me by the laws of Illinois, and the By-Laws of the Korean Foundation, Inc., hereby suspend you as a Trustee and honorary member of the Korean Foundation, Inc." On the same day Hahn also wrote Dean McSwain advising him that his election on March 6, 1956, was illegal because there had not been a corporate resolution authorizing a meeting other than at Stone Manor, Lake Geneva, Wisconsin, and further stated: "There was no quorum at the meeting because only Dr. Eurich and myself were present and Dr. Mathews and Mr. Trainor were absent. (Mr. Trainor's resignation was not effective because it was not formally accepted by the Board of Trustees, and furthermore, his successor was not elected.)"

On June 23, 1956, Hahn, who testified that he considered himself to be the sole remaining member and trustee of the Foundation, held a meeting at Stone Manor, Lake Geneva, Wisconsin, and purported to elect five new members and trustees. The newly elected "Board of Trustees" took action authorizing the officers to cash the government bonds which represented the total funds of the Foundation and invest them for higher income. Hahn testified that several proposals were considered but that the "Board" authorized the officers to purchase either Stone Manor or Korean

Village at a fair price and to lease the properties back to Hahn's corporation (Oriental Trading Company) or to him personally for 25 years at a net rental with over 8% return. This resolution was adopted by a unanimous vote. The minutes of the meeting stated that Hahn offered his Stone Manor property to the Foundation "for $114,500.00 clear, which is less than his cost in 1945." After this purported meeting of June 23, 1956, Hahn removed the $100,000 treasury bond from the safety deposit box and delivered it to the officers of the Foundation. One of the newly elected officers took the bond to a bank in Chicago and gave directions to cash it. This was done a few days before the instant suit was filed.

Hahn testified that his Korean Village was producing $6,000 annual income, consisting of $3,000 rent from his Oriental Trading Company and $3,000 rent from three apartments. Hahn's Stone Manor property was also alleged to be income-producing. Hahn was asked what the net profits of the Oriental Trading Company had been during the last five years. He responded that "I certainly do not care to disclose such a question like that, because that is not involved in this matter." The master indicated to the witness that he considered the question material since Hahn wanted the Foundation to make this investment. Nevertheless Hahn persisted in his refusal to answer because he did not care to disclose his net profits at the hearing. An exhibit introduced by Hahn indicates that his business enterprises had been operating at a $5,000 per year loss at least since 1946. Mr. Trainor testified that he was unsuccessful in finding a bank that would assist Hahn's business enterprises with some financing. From the testimony the master concluded that Hahn had not established his solvency and that he appeared to be financially involved to a point where it was difficult for him to extricate him-

484

■■■■■■■■■■■■■■■

self. The By-Laws of the Foundation require members, except such honorary members as plaintiffs, to contribute $100 a year membership fee. Hahn testified that no membership fees were collected from the time of the 1954 decree until after this suit was instituted. When his counsel requested a retainer Hahn testified that he then collected $600 for Foundation membership fees and turned the amount over in cash to his counsel. His counsel later represented to the master that he received Hahn's personal check for $600, although the Foundation had a checking account.

■ ■ Defendants say that plaintiffs had no capacity to bring their suit, and point out that the Not-for-profit Act grants courts of equity power to liquidate the assets and affairs of a corporation in a suit by a member or director under certain circumstances. Defendants insist that McSwain never became a trustee, that Eurich and Mathews, plaintiffs, were removed as directors and honorary members at a meeting held on June 23, 1956, and that it is inescapable that plaintiffs had no capacity to bring the suit. On the day the June 4, 1954 decree was entered, plaintiffs together with Hahn, Paul Daily and Edward Trainor constituted the board of trustees and membership of the Foundation. The decree provided that the trustees were to serve a term ending on the day preceding the first Monday in May, 1956, and/or until their respective successors had been duly elected. A notice of a special meeting of the board to be held on March 6, 1956 was sent out by Hahn to plaintiffs and Edward Trainor. Dr. Mathews was unable to attend the meeting but Dr. Eurich and Hahn met in the office of the Foundation's attorney, Mr. Morris, in Chicago on March 6 pursuant to the notice. At that meeting Mr. Morris informed Hahn and Dr. Eurich that Trainor had resigned and indicated he thought it advisable to elect another member to the board.

485

Trainor testified that he wrote a letter of resignation dated March 5, 1956, to plaintiffs, Hahn and the Foundation which he mailed on March 6, 1956. It is undisputed, however, that Morris communicated Trainor's resignation to Hahn and Eurich at the meeting of March 6, 1956, and that Hahn acted in reliance thereon. A resignation may be either written or oral and is effective immediately without the necessity of an acceptance, unless it is tendered to take effect only upon acceptance. 19 CJS Corporations, Sec 736b. Section 9 of Article III of the By-Laws provides that a majority of the elected and acting members of the board of trustees shall be necessary to constitute a quorum for the transaction of business at any meeting. With Trainor's resignation the only three elected and acting members of the board of trustees were plaintiffs and Hahn. Trainor had abandoned all intentions to further serve the Foundation. Since two of the three acting trustees were present at the meeting, they constituted a quorum and were able to transact Foundation business. Hahn considered the meeting a legal one since he participated in the election that day whereby Dean McSwain was elected to membership on the board of trustees. Since Dean McSwain could not meet with Hahn and Eurich on the 6th, another meeting was held on the following morning at which the action relating to the resolution granting $3,000 to Dean Meinecke was taken. Hahn is estopped to attack the validity of the meeting or the action taken therein.

██ Defendants say that the meetings of March 6 and March 7 were invalid because they lacked a quorum. They also state that since there was no legal meeting on the 6th there could not be a postponement until the 7th. We have held that there was a quorum at the meeting on the 6th.

486

Defendants further insist that none of the parties considered the meeting of March 6 a formal meeting, that the meeting scheduled for that day was in fact canceled after Mathews advised he was unable to attend. This is contrary to the position Hahn took at the time in his letter of April 14, 1956, to Dean Meinecke. He said that the trustees of the Foundation were "very happy" to vote for the $3,000 contribution towards her good work in Korea at its special meeting held in Chicago on March 6, 1956. Clearly, Hahn then regarded the March 6 meeting as a valid one.

 We turn to a consideration of defendants' contention that plaintiffs were lawfully removed as trustees and honorary members by the action of the Foundation members and trustees at a meeting held on June 23, 1956. Hahn was a director and also president of the Foundation. Eurich and Mathews were honorary members. Honorary members had the right to vote for the board of trustees. The board of trustees was a hold-over board. At the June 23 meeting Hahn considered himself as the only member and trustee of the Foundation. He could not hold a valid meeting by himself unless he were the sole member and trustee of the Foundation. Although Hahn purported to remove plaintiffs as members and trustees by his letter of June 22 to prevent the holding of an illegal meeting, the power to remove or suspend members or trustees is expressly vested by the By-Laws in the board of trustees and not the president. In our opinion Hahn lacked authority to suspend plaintiffs. A majority of the regular, life and honorary members of the Foundation was necessary to constitute a quorum for the transaction of business. Pursuant to Section 3 of Article II of the By-Laws, no new members could be elected to the Foundation without the approval of their application by the board of trustees. The board

of trustees could not transact business without a majority of the trustees being present. Since Hahn was the only member and trustee present on June 23, 1956, it is apparent that no meeting could be held for lack of a quorum. The trustees continued in office until their successors were elected. We find that the decree was right in concluding that the June 23, 1956, meeting was invalid. Plaintiffs had a right to institute and prosecute their complaint.

Defendants urge that plaintiffs have no standing to sue because they have not come into equity with clean hands and are not the real parties in interest. In our opinion plaintiffs came into equity with clean hands and are the real parties in interest. They do not attempt to have the funds returned to the Pfeiffer estate. The filing of the complaint was precipitated by Hahn's attempt to oust plaintiffs and to invest the Foundation's funds in his Lake Geneva property. There is no evidence to support the imputation of base motives to plaintiffs.

 Defendants assert that the record does not disclose any statutory grounds for the order of dissolution. Plaintiffs do not charge Hahn with fraud and there is no evidence that he was guilty of fraudulent acts. We conclude that the chancellor was right in decreeing the dissolution of the Foundation because of the illegal and oppressive acts of Hahn who was president of and considered himself in complete control of the Foundation, the actual and threatened waste and misapplication of the Foundation assets and the inability of the Foundation to carry out its purposes. Hahn arbitrarily and wrongfully attempted to oust plaintiffs from membership on the board and from their position as members of the Foundation. The master found that this was done to permit Hahn to hand-pick a board which would allow him to invest the Foundation funds in his Lake Geneva property.

Hahn used the Dean Meinecke grant to bargain with Dr. Eurich regarding the investment. Hahn persisted in attempts to invest the entire assets of the Foundation in his Lake Geneva property. A trustee is prohibited from self-dealing with the trust estate. The investment of the total assets of the Foundation in Hahn's property would be a waste and misapplication of the funds. The record sustains the finding that the Foundation is unable to carry out its purposes. The funds of the Foundation have been steadily eroded by litigation and its purposes frustrated by Hahn's attempt to apply the funds to his own shaky enterprises. The Foundation apparently received no funds other than the funds from the Pfeiffer estate. The possibility of the Foundation ever being able to successfully raise additional funds with its history of litigation and mismanagement by Hahn is remote. The decree is based upon the total frustration of the Foundation purpose by the totality of the various individual acts. Only through dissolution can there be any possibility that some Koreans may benefit by what remains of the funds provided by Mrs. Pfeiffer's will.

██ Defendants suggest that the court could have enjoined the threatened reinvestment of the Foundation funds in Hahn's real estate if it deemed such investment improper, and that there was no need to resort to dissolution. Ample grounds exist for the dissolution as found by the master. Defendants maintain that the chancellor erred in ordering the assets turned over to the American Korean Foundation and in appointing plaintiffs as receivers. The American Korean Foundation is a non-profit, nonsectarian voluntary organization set up to help Koreans help themselves after the Korean conflict. It numbers among its directors Dr. Milton Eisenhower, General Mark Clark, Herbert Hoover and Arthur Rubloff. It is active in the field of education and health and wel-

fare programs. Over 400 graduate students have been brought to the United States under its auspices. In addition to a staff in New York and Korea, the American Korean Foundation has a full-time administrative assistant in Korea who is a specialist in education, working closely with the Korean Ministry of Education. Dr. Dorothy Frost, the executive officer of the American Korean Foundation, testified that the American Korean Foundation would accept and use the funds involved solely for the purposes set forth in the charter of the Korean Foundation, Inc., without any administrative expense against the fund.

Plaintiffs were not appointed receivers of the Korean Foundation. The chancellor directed the plaintiffs as trustees of the Foundation and parties to the litigation to pay over the sole asset of the Foundation to the American Korean Foundation after payment of fees and expenses allowed in the litigation. The statute expressly authorizes distribution of the assets upon dissolution to a foreign corporation.

For the reasons stated the decree is affirmed.

FRIEND, P. J. and BRYANT, J., concur.